No. 2481.

## J. W. BROOKS *v.* THE STATE.

1. MURDER—MANSLAUGHTER—SELF DEFENSE—CHARGE OF THE COURT.—
   See the opinion and the statement of the case for evidence on a murder trial *held* not to raise the issue either of manslaughter or of self defense; wherefore the trial court properly refused to instruct the jury upon those questions.

2. CONTINUANCE.—The ruling of the trial court refusing a continuance will not be revised by this court unless, in addition to its other requisites, the application shows the relevancy and materiality of the absent testimony.

3. SAME—PRACTICE—THREATS.—Proof of deadly threats made by the deceased against the accused, and that the deceased was a violent and dangerous character, and that the threats and the character of the deceased

were known to the accused at the time of the homicide, can afford no justification for homicide without proof that, at the time of the homicide, the deceased did some act indicating a present intention to kill the accused or do him serious bodily harm. Neither the evidence adduced on the trial nor that foreshadowed in the application for continuance laid a predicate for proof of threats in this case; wherefore a continuance was properly refused.

Appeal from the District Court of Navarro. Tried below before the Hon. Sam R. Frost.

The conviction in this case was in the second degree for the murder of E. H. Moses, and the penalty assessed against the appellant was a term of fifty-five years in the penitentiary.

A. N. Stewart was the first witness for the State. He testified that he formed the acquaintance of the defendant and the deceased at the same time, about Christmas, 1886. The witness and deceased, returning from a fishing excursion, reached the witness's house about eleven o'clock on the morning of April 7, 1887. Witness's brother hitched up his wagon to go to his mother-in-law's, and witness and deceased went with him as far as the deceased's house, when they, witness and deceased, stopped. Deceased remarked that he would get a drink of water and then take a look at his corn. Witness and deceased then went through the house to the well, and back through the house to the garden, and thence to the barn to see if deceased's efforts to poison rats had succeeded. About the time that witness and deceased reached the barn, the defendant came to the house from his field, where he had been planting cotton. Witness and deceased then went back to the house. Passing defendant at the well, witness addressed him, "Howd'y do?" Defendant returned the salutation in a somewhat sulky tone of voice. Deceased passed on to the kitchen door, where he sat down on the step. Just as defendant turned as though to go back to his work in the field, the deceased said to him: "Jo., I suppose you want to hire a hand to work out my part of the crop." Defendant turned and walked back to a point about five feet distant from deceased and replied: "Eg., I did say it." Deceased then said: "I want you to distinctly understand that I am running my part of the crop." A violent quarrel then ensued, the deceased cursing the defendant, and the defendant cursing back. One word brought on another, and finally the collision. Witness did not see the first blow struck. He had looked away, but heard the sound of a

blow. He then looked back and saw that a gash had been cut in deceased's jaw, and that defendant had a knife in his hand. Witness saw no weapon in the hands of the deceased. Defendant had the knife in his hand when he approached deceased from the well. The two parties being clinched, the deceased called to witness to pull the defendant off him, as defendant was cutting him to pieces. Witness rushed toward the parties, when defendant made a blow at him with the knife. The deceased finally broke from the defendant's embrace and fled, running in a circle through the orchard, pursued by the defendant. The witness followed defendant, who turned his head and told witness that if he ran up on him, that he would cut witness. The deceased stumbled once in flight, but recovered himself and ran into the house, followed by defendant, until he sank down near the door.

The witness did not think that deceased appeared angry, or spoke angrily when he addressed the defendant about hiring a hand to work the crop, but he became angry as the quarrel progressed. When he walked up to deceased from the well, the defendant appeared to be half crying, and was jerking all over. He said to deceased: "Eg., I did say it; you ought to stay at home and work your crop." Witness was not looking at the parties when the first blow was struck, but heard the blow and turned immediately and discovered the gash on deceased's jaw. The witness could not tell how the cutting was done. The defendant held deceased clasped so closely in his embrace that witness could not detect the movements of his hands. He held deceased at least a minute and a half before deceased escaped, and in that time could have cut him several times. The only time witness heard deceased halloo was when he called to witness to take the defendant off. The defendant did not cut deceased after the latter got loose from him. Of that fact the witness was absolutely certain. He was not near enough deceased during the latter's flight, except when the latter stumbled, and he did not cut then. Witness left immediately after the cutting and before the deceased died. He saw the defendant's knife. It had two small blades in one end and a large blade in the other end. Witness plainly saw the deceased bleeding at the jugular vein on the left side of the neck. The blood was spouting out in a torrent. He afterwards saw wounds on the deceased's neck, jaw, arm, side and breast. The wounds in the side and breast were stabs. Deceased had just got up from the puncheon at the

kitchen door when he and defendant clinched.   Defendant was the taller of the two men, but did not weigh as much as the deceased by twenty pounds.   The homicide occurred in Navarro county, on the seventh day of April, 1887.

On his cross examination, the witness said that he and deceased went fishing on the day before the homicide.   Witness was on his way to Farmer's house when he stopped with the deceased at his, the deceased's, house.   Defendant and deceased did not speak to each other when the latter and witness first met him at the well.   Witness did not understand the words uttered by either party during the quarrel, except that a great many of them were oaths.   Witness was very much excited.   The parties were clinched and the deceased was bleeding from cuts on the neck and jaw when witness, having looked from them, looked back after the sound of the first blow.   Witness did not know which of the parties struck the first blow, nor did he know which of the blades of the knife was used by defendant.   Witness was standing about ten feet from the parties when the fighting commenced.   Witness did not hear deceased, during the fishing excursion, say anything about a probable row between himself and defendant or anybody else.   Witness had, on occasions previous to the fatal day, heard defendant and deceased address each other roughly, but never thought that they meant what they said.   In his flight after the cutting, the deceased led the defendant about eight feet.   Deceased kept dodging around defendant as he ran.   The deceased spent some time at witness's house on the day before he and witness went fishing.   Some one then at witness's house said to deceased: "You and Jo. come and go with us fishing."   Deceased replied: "He can do as he pleases."   A boy at the witness's house on that day told deceased that he heard defendant say that he would hire a hand to work in the place of the deceased.   Deceased appeared to be angered by this information, and when he spoke to defendant about it he spoke angrily.   Deceased went to Hubbard's house a few days before the fishing excursion, remaining there a day or two.   Witness thought that deceased's wife stayed at Cox's until deceased returned from fishing.   Witness had no recollection of seeing Mrs. Moses during the row until the deceased ran into the house.   Deceased once told the witness that the defendant, when angry, would cry.   Witness never saw the defendant cry except on the occasion of that fight.   After cutting the deceased, the defendant went for the doctor.   Witness next saw the defendant on the next day at

Justice Carroll's office, about half a mile from the place of the killing. Immediately after the cutting, witness went off to send some of the women to Mrs. Moses. Thence he went to his home at his uncle's house, about a mile from the place of the killing. The fight occurred about two o'clock in the afternoon.

On his redirect examination, the witness said that the defendant, at Justice Carroll's office, gave him the knife with which he cut the deceased, and the witness gave it to Justice Carroll at the inquest.

—— Ramsdell testified, for the State, that while he was at work in his field, on the seventh day of April, 1886, he heard a woman's voice at deceased's house crying: "He's dead! He's dead!" The witness went immediately to the house, and found deceased lying on a pallet. He was not yet dead, but was speechless. Witness saw and examined only the wounds on the jaw and the left side of the neck.

Doctor Buckalew testified, for the State, that he did not reach Moses until after his death. He then examined the wounds, two of which he pronounced necessarily mortal.

A. V. Cox was the next witness for the State. He testified that he was one of the parties in the fishing excursion, testified to by the witness Stewart. He left the party at Blooming Grove, on the day of the killing, and went home, lay down on his bed and went to sleep. He was awakened after sleeping some time, and informed that Stewart had reached the house and had reported the cutting of Moses. Witness then went to Moses's house, reaching it but a few moments before Moses died. Some time prior to the fatal difficulty, the defendant came to witness to borrow a pistol, explaining that Thompson was after him for aiding in the elopement of his daughter and the deceased. Witness had just before observed the defendant and the deceased when they parted, going in different directions, after an apparently earnest conversation. He refused to lend the pistol to the defendant, and the defendant replied that he knew where the witness kept his pistol, and would go to witness's house and get it, explaining to witness's wife that he had conditionally purchased it. Witness replied that his wife was too well posted to be imposed upon in that way, and that furthermore he (witness) would follow him to the house. Defendant several times tried to borrow witness's pistol, always assigning his trouble with Thompson as his motive, except on the last effort he made, when he said that he and Thompson had become reconciled. On the

last evening he tried to borrow the pistol, the defendant remarked: "I may finish this crop, but if things don't change I won't." Witness told him that in that event he would have to work to make a living, and he replied: "I will put myself in a fix that I won't have to work." He did not explain what he meant. He several times told witness that Moses had had his own way, and had done all the blowing and cursing; but that the longest lane had a turn, and things would have to change. Witness heard Moses, on the fishing excursion, speak jokingly of defendant's names for different parts of a complicated high pressure steam engine, and about defendant's claim of being a machinist. At the time of the killing, Moses and the defendant had dissolved their partnership as to the house they jointly occupied, but not as to the crop.

The original cause of the falling out between the defendant and the deceased was a disagreement between defendant and the deceased's wife. Something was said to deceased on the fishing excursion about the quarrel between his wife and defendant, and witness asked deceased why he did not take up his wife's quarrel. Deceased replied that defendant only made out like he wanted to fight, and that he had told defendant that when he wanted a fight he could get it. Witness once heard the deceased and defendant quarreling about some chickens, during the course of which quarrel the deceased did some violent cursing, and told defendant that he could whip him quicker than hell could scorch a feather. On another occasion witness heard deceased speak roughly to defendant about whittling in the house. He called defendant a d—d fool, and required defendant to sweep up the litter he had made. On one occasion the defendant told witness that he anticipated trouble with deceased when they came to settle their accounts; that he had kept an account of the time deceased had not worked, and that deceased had kept no such account.

Justice of the Peace Carroll was the next witness for the State. He testified that about four o'clock in the afternoon of April 7, 1886, the defendant surrendered to him, explaining that he had probably killed E. H. Moses. Witness had heard of the killing, and was then on his way to the scene. The inquest was held about sun set. Just before the inquest Joe Stewart gave witness the knife with which it was said the cutting was done. The knife had a large blade, about three and a half or four inches long, and had two small blades.

Dock Faglea testified, for the State, that both the defendant and deceased had talked to him about frivolous disagreements to which the witness attached no importance, and which he always advised them to drop. The defendant appeared to feel that he had done a great deal for the deceased and his wife, and that they did not appreciate his services or treat him as he ought to be treated by them. He did not appear to approve of the deceased going off fishing, and leaving him to work the crop, though he said that deceased had authorized him to charge lost time against him at a stipulated price. About a month before the killing the deceased caught one of two chickens, then fighting, and threw it on the defendant's bed. The defendant told deceased that he was inclined to take his bed into the room occupied by deceased and his wife. Deceased replied that such a proceeding would produce a pair of black eyes. Defendant complained of that episode to witness.

Mrs. E. H. Moses, the widow of the deceased, testified, for the State, that she was sitting inside of the door, and her husband on the steps on the outside, when the fatal quarrel began. She heard her husband say to the defendant: "I heard you were going to hire a man to work the crop. You can hire Joe Stewart and Dolly and I will go fishing every day." Witness did not see the first cutting. Deceased fled into the house, pursued by the defendant, and after he fell to the floor the defendant cut him the last time. Deceased never spoke after he fell. Defendant came to Cox's house, where witness was staying, on the night before the killing. He borrowed a whetstone from Mrs. Cox, and after sharpening his knife, he said: "I don't expect to work any more after to-morrow." About a month before the killing, the defendant conceived the idea that witness and a young girl visitor were talking about him, and said to witness: "This will cause you many thousands of bitter tears." Witness and deceased were married on the twenty-second day of December, 1886.

On her cross examination, the witness said that both deceased and Stewart were sitting on the door step when the row first commenced. The defendant, after getting a drink of water, sat down on a box near the deceased. After making the remark quoted by the witness on her direct examination, the deceased said to the defendant: "The days that you lose you pay for, and the days that I lose I will pay for." Within a few moments witness saw Stewart run across the doorway, and she knew instantly

that something was wrong. Witness then stepped to the door and saw the deceased running and the defendant following him, but she did not know that defendant then cut the deceased. When the deceased started fishing on the day before, he asked defendant if he wanted to go, and proposed to stay at home and work if defendant would go. Defendant replied: "No, by God; I am going to stay at home and work." The witness knew of but one previous quarrel between defendant and deceased, and that occurred upon the defendant's threat to move his bed into the room occupied by witness and deceased. The witness had known the defendant about six years, during which time, until the quarrel spoken of, he and deceased were on friendly terms. Defendant was working for witness's father until witness's marriage, which her father opposed because of her youth. The defendant aided witness and deceased in eluding the vigilance of witness's father and in getting married. His part in that transaction enraged witness's father, and he discharged the defendant. Defendant and deceased then formed a co-partnership, and went to "cropping" together. Defendant's threat to move his bed into witness's room outraged her feelings, and she told the defendant that she had no further use for him. That angered the defendant and he refused to permit the witness to cook for him any longer, remarking that he would not allow any one to cook for him who cared nothing for him. On that occasion the defendant and the deceased cursed each other.

The State closed.

Sam Stewart testified, for the defense, that he was one of the parties who went fishing on the day of the homicide. While on that excursion the witness heard the deceased ridiculing defendant for calling different parts of a steam engine by improper names. In that same connection deceased said that he was going to have a row with defendant as soon as he got home, because defendant had threatened to hire a hand in his place. Witness attempted to dissuade him from his avowed purpose to provoke a difficulty with defendant, but deceased would not be dissuaded. He said that he was not afraid of defendant; that he could whip defendant before he could turn around, and that he was going to force a row as soon as he got home. This conversation occurred on the day of the killing, just before the fishing party started home.

Cross examined, the witness said that he was the brother of the State's witness, A. N. Stewart. The words of the deceased

were as follows: "When I get home I am going to give Brooks to understand that I am partly boss on that hill. I am going to curse him and raise a row with him." Deceased did not say that he was going to hurt defendant in any particular way. When the fishing party, on their return home from fishing, passed the field of deceased and defendant, witness saw defendant down in the field, planting cotton.

.Bud Griffin testified, for the defense, that he was at work in the field, a half mile from the scene, when the cutting·occurred. He knew nothing about the particulars of the fatal difficulty. Just after the cutting, witness went after Mr. Thompson, the father of Mrs. Moses.

The important portion of the testimony of the defendant's witness, George Leftwich, was to the effect that, some time before the killing, the deceased told witness that he and defendant were not getting along well together. He often told witness that defendant was a coward, and that he had made defendant cry many times.

Mr. Spriggs testified, for the defense, that the deceased worked for him in March or April, 1886. At that time defendant and deceased were on exceedingly intimate terms. The deceased told witness that defendant was going to help him get a wife, and that defendant had some means, and was going to crop with him.

Mr. Thompson testified, for the defense, that the defendant lived and worked with witness three years in Alabama; then came to Texas with witness, and worked one year with him. Shortly after his arrival in Texas, the defendant contracted a severe case of the "Texas big head;" helped deceased elope with witness's daughter, and witness discharged him. Witness was opposed to his daughter's marriage on account of her youth. Defendant was a good work hand.

W. C. Pauley testified, for the defense, that in the course of a conversation with deceased, some time before the homicide, deceased said that he and defendant were partners in the crop, but were not getting along well. Witness asked him why he did not either buy or sell out to defendant. Deceased replied that he would work on a while longer and get all of defendant's share for nothing. On his cross examination, the witness said that he was never introduced to the deceased, and never saw him but twice before the meeting at which this conversation occurred.

The defense closed.

Mr. Faglea, recalled by the State, testified that, when he heard the hallooing at deceased's house, he left his work in his field and started to the said house. En route he met defendant, riding his, witness's, horse. He asked the defendant what the trouble at the house was. Defendant replied that he had cut deceased and was going for a doctor. Witness took his horse from defendant and sent his son for the doctor. Defendant remained at witness's house about thirty minutes after witness got back from deceased's house. He asked witness's advice about what to do. Witness advised him to go to 'Squire Carroll and surrender. Defendant then went off, declaring his purpose to surrender to Carroll.

*Scott & Ballew,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. As the evidence in this case impresses itself upon our minds, it does not raise the issues of manslaughter and self defense, or either of said issues, and therefore the court did not err in refusing to instruct the jury upon the law of such issues. The only eye witness to the homicide states that the deceased and the defendant were standing some five feet apart, deceased unarmed, defendant with a knife in his hand. They were quarreling. Witness looked in another direction and did not see the first lick struck. He heard a blow, however, and immediately looked toward the parties and saw a gash in deceased's jaw. Deceased then called to witness and said: "Pull him off; he is cutting me all to pieces." Witness rushed up to the parties, and defendant with his knife struck at witness. Deceased finally broke loose from defendant and ran fifty or sixty yards, around in a circle, and into the house, where he sank down and died. Defendant ran after deceased, attempting to again cut him, and did again cut him after deceased had sank down in the house. Witness ran after the defendant as defendant was chasing the deceased, and called out to defendant to quit and let deceased alone. Defendant turned his head and told witness if he, witness, came on to him he would cut him. These are the uncontradicted facts as developed by the record. Giving to the entire evidence the most favorable consideration for the defendant, the homicide could not be of a lower grade than murder in the second degree, and excludes the theory of self defense.

II.   There was no error in refusing defendant's application for a continuance.   Conceding that sufficient diligence had been used to obtain the alleged absent testimony, it does not appear from the application that the said alleged testimony was material.   Proof of threats made by deceased to take defendant's life, and that deceased was a man of violent and dangerous character, and that defendant had knowledge at the time of the homicide of such threats and character of deceased, would be immaterial, unless it was shown that at the time of the homicide the deceased did some act indicating his purpose then to take the life of the defendant, or do him serious bodily harm. (Wilson's Texas Crim. Laws, secs. 1052, 1053, 1054.)   The application for continuance does not show the materiality of the testimony as to threats and the character of the deceased by alleging that deceased, at the time of the homicide, did any act indicating a purpose to injure the defendant.   Nor does the evidence adduced on the trial show any such act on the part of the deceased, and if said absent testimony had been adduced on the trial, it would have been irrelevant and immaterial, and could not have afforded the defendant any justification.

III.   There was no error in overruling the defendant's motion for a new trial.   The attempt made to show misconduct on the part of the jury was fully met and successfully answered by the State.

We have found no error in the conviction, and the judgment is affirmed.

*Affirmed.*